

EXHIBIT 2

PLD-C-001

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
DARREN EASTMAN
21446 ONEDA CT.
LOS GATOS, CA 95033

TELEPHONE NO: 650-215-3313   FAX NO. *(Optional):*
E-MAIL ADDRESS *(Optional):* DARREN@EASTMANTECHNOLOGIES.COM
ATTORNEY FOR *(Name):*

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  SANTA CLARA
STREET ADDRESS:
MAILING ADDRESS: 191 N. FIRST STREET
CITY AND ZIP CODE: SAN JOSE 95113
BRANCH NAME: DTS - CIVIL

PLAINTIFF: DARREN EASTMAN

DEFENDANT: APPLE, INC.

☐ DOES 1 TO _____

Electronically Filed
*FOR COURT USE ONLY*
by Superior Court of CA,
County of Santa Clara,
on 8/22/2018 1:01 PM
Reviewed By: R Jimenez
Case #18CV333181
Envelope: 1862777

**CONTRACT**
☐ COMPLAINT   ☑ AMENDED COMPLAINT *(Number):* 1
☐ CROSS-COMPLAINT   ☐ AMENDED CROSS-COMPLAINT *(Number):*

Jurisdiction *(check all that apply):*
☐ ACTION IS A LIMITED CIVIL CASE
   Amount demanded  ☐ does not exceed $10,000
                    ☐ exceeds $10,000 but does not exceed $25,000
☑ ACTION IS AN UNLIMITED CIVIL CASE (exceeds $25,000)
☐ ACTION IS RECLASSIFIED by this amended complaint or cross-complaint
      ☐ from limited to unlimited
      ☐ from unlimited to limited

CASE NUMBER:
18CV333181

1. Plaintiff* *(name or names):*
   DARREN EASTMAN

   alleges causes of action against **defendant*** *(name or names):*
   APPLE, INC.

2. This pleading, including attachments and exhibits, consists of the following number of pages:  43

3. a. Each plaintiff named above is a competent adult
      ☐ **except plaintiff** *(name):*
         (1) ☐ a corporation qualified to do business in California
         (2) ☐ an unincorporated entity *(describe):*
         (3) ☐ other *(specify):*

   b. ☐ Plaintiff *(name):*
      a. ☐ has complied with the fictitious business name laws and is doing business under the fictitious name *(specify):*

      b. ☐ has complied with all licensing requirements as a licensed *(specify):*
   c. ☐ Information about additional plaintiffs who are not competent adults is shown in Attachment 3c.

4. a. Each defendant named above is a natural person
      ☑ **except defendant** *(name):*                    ☐ **except defendant** *(name):*
         (1) ☑ a business organization, form unknown         (1) ☐ a business organization, form unknown
         (2) ☐ a corporation                                 (2) ☐ a corporation
         (3) ☐ an unincorporated entity *(describe):*        (3) ☐ an unincorporated entity *(describe):*

         (4) ☐ a public entity *(describe):*                 (4) ☐ a public entity *(describe):*

         (5) ☐ other *(specify):*                            (5) ☐ other *(specify):*

* If this form is used as a cross-complaint, plaintiff means cross-complainant and defendant means cross-defendant.   Page 1 of 2

Form Approved for Optional Use
Judicial Council of California
PLD-C-001 [Rev. January 1, 2007]

**COMPLAINT—Contract**

Code of Civil Procedure, § 425.12

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| EASTMAN v. APPLE, INC. | 18CV333181 |

4. *(Continued)*

    b. The true names of defendants sued as Does are unknown to plaintiff.

        (1) ☐ Doe defendants *(specify Doe numbers):* _____ were the agents or employees of the named defendants and acted within the scope of that agency or employment.

        (2) ☐ Doe defendants *(specify Doe numbers):* _____ are persons whose capacities are unknown to plaintiff.

    c. ☐ Information about additional defendants who are not natural persons is contained in Attachment 4c.

    d. ☐ Defendants who are joined under Code of Civil Procedure section 382 are *(names):*

5. ☐ Plaintiff is required to comply with a claims statute, **and**

    a. ☐ has complied with applicable claims statutes, *or*

    b. ☐ is excused from complying because *(specify):*

6. ☐ This action is subject to ☐ Civil Code section 1812.10 ☐ Civil Code section 2984.4.

7. This court is the proper court because

    a. ☑ a defendant entered into the contract here.

    b. ☐ a defendant lived here when the contract was entered into.

    c. ☐ a defendant lives here now.

    d. ☑ the contract was to be performed here.

    e. ☑ a defendant is a corporation or unincorporated association and its principal place of business is here.

    f. ☐ real property that is the subject of this action is located here.

    g. ☐ other *(specify):*

8. The following causes of action are attached and the statements above apply to each *(each complaint must have one or more causes of action attached):*

    ☑ Breach of Contract

    ☐ Common Counts

    ☑ Other *(specify):*

    §98.6, §98.7, §201, §1102.5, §3294, §3355, §3336, §11065, §11068, §12940

9. ☑ Other allegations:

    35 USC §256, 125 Stat.284

10. **Plaintiff prays** for judgment for costs of suit; for such relief as is fair, just, and equitable; and for

    a. ☑ damages of: $ 326,400

    b. ☑ interest on the damages

        (1) ☐ according to proof

        (2) ☑ at the rate of *(specify):* 10 percent per year from *(date):* October 1,2014

    c. ☑ attorney's fees

        (1) ☑ of: $ 5,000

        (2) ☐ according to proof.

    d. ☑ other *(specify):*

    See complaint for additional remedies

11. ☐ The paragraphs of this pleading alleged on information and belief are as follows *(specify paragraph numbers):*

Date: 20 AUG 2018

DARREN EASTMAN

▶

          (TYPE OR PRINT NAME)                             (SIGNATURE OF PLAINTIFF OR ATTORNEY)

*(If you wish to verify this pleading, affix a verification.)*

Darren Eastman
21446 Oneda Ct.
Los Gatos, CA 95033

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SANTA CLARA

| | |
|---|---|
| **DARREN EASTMAN,** | Case Number **18CV333181** |
| Plaintiff, | |
| vs. | Date Action Filed: 8/13/2018 |
| **APPLE, INC.,** | |
| Defendant | **FIRST AMENDED COMPLAINT** |

Demand's unlimited, exceeding $25,000 per *CCP* §85-86.1. Per **Rule 8.204**, this complaint's 10,313 eligible words.

Table of Authorities ………………………………………………...ii

Introduction ……………………………………………………1

Statement of Facts …………………………………………...3

Causes of Action ………………………………………………...14

    #1 Utility Patent Nonjoinder & Reputational Damage

    #2 Wrongful Termination …………………………………..16

    #3 Conversion of Restricted Stock Units ……………………25

    #4 Violating Covenant of Good Faith & Fair Dealing ………..28

    #5 Conversion of Personal Property …………………………31

    #6 Emotional Distress ……………………………………..32

Demand for Relief ………………………………………………...37

# TABLE OF AUTHORITIES

## Cases

*Acadia, California, Ltd. v. Herbert* (1960) 54 Cal.2d 328 .........33, 34

*Agostini v. Strycula* (1965) 231 Cal.App.2d 804 .........................35

*Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493 ............34, 35

*Alvarez v. New Haven Waste Material Corp.* (1999) 111 Conn. 377..36

*Allamakee County v. Collins Trust* (1999) 599 N.W.2d 448 ...........31

*Artists Embassy v. Hunt* (1958) 157 Cal.App.2d 371 ...................31

*Bobo v. Vanguard Bank & Trust Co. Inc.* (1987) 512 So.2d 246 ......31

*Bowden v. Spiegel, Inc.* (1950) 96 Cal.App.2d 793 ......................35

*Brader v. Schaeffer* (1976) 193 USPQ 627, 631 .........................4

*Bruner v. Geneva County Forestry Dept.* (2003) 865 So.2d 1167 ....31

*Buckaloo v. Johnson* (1975) 14 Cal.3d 815 ..............................25

*Caldwell v. Paramount Unified School District* (1995)
41 Cal.App.4th 189 ........................................................21

*Carr v. Wm. C. Cromwell Co.* (1946) 28 Cal.2s 652 ..............5, 21, 36

*Chelini v. Nieri* (1948) 32 Cal.2d 480 ....................................33

*Chou v. Univ. of Chi.* (2001) 254 F.3d 1347, 1357 Fed. Cir ............15

*City of Houston v. Van De Mark* (2002) 83 S.W.3d 864 ................32

*Collier v. Superior Court* (1991) 228 Cal.App.3d 1117, 1121 ..........17

*Consolidated World Investments, Inc., v. Lido Preferred Ltd.*
(1992) 9 Cal.App.4th 373 ...................................................29

*Continental Casualty Co. v. Garrett* (1935) 173 Miss. 676 .............35

*Crisci v. Security Ins. Co.* (1967) 66 Cal.2d 425 ........................34

*Cyrus v. Haveson* (1976) 65 Cal.App.3d 306 .............................26

*Della Penna v. Toyota Motor Sales, Inc.* (1995) 11 Cal.4th 376 ........22

*Doyle v. Scott's Cleaning Co.* (1930) 31 S.W.2d 242 ....................36

*Emden v. Vitz* (1948) 88 10 Cal.App.3d 396 ……………….…………...35

*Ethicon Inc. v. United States Surgical Corp.* (1998) 135 F.3d 1456 ……4

*Fletcher v. Western National Life Insurance Co.*

(1970) 10 Cal.App.3d 376 …………………….…………………....33-35

*Foley v. Interactive Data Corporation* (1988) 47 Cal.3d 654 ………….17

*Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85 ………..30

*Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083 ………………………17

*Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34 …………..22

*Golden v. Dungan* (1971) 20 Cal.App.3d 295 ……………………..……35

*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 79-80 ………....17

*Haigler v. Donnelly* (1941) 18 Cal.2d 674 ……………………………..26, 33

*Haines v. Parra* (1987) 193 Cal.App.3d 1553 ……………………..…….25

*Harm v. Frasher* (1960) 181 Cal.App.2d 405 ……………….…………..30

*High-Tech Employee Antitrust Litigation* (N.D. Cal. 2015) ………....8, 23

*Higgins v. Watervliet Turnpike Co.* (1871) 46 N.Y. 23 ………………..36

*Hiroshima v. Pacific Gas & Electric Co.* (1936) 18 Cal.App.2d 24 …….36

*In re DeBaun* (1982) 687 F.2d 459 ……………………………………….5

*Iowa St. Univ. Research Foundation, Inc. v. Honeywell Inc.* (1971)

444 F.2d 406, 170, 374 (8th Cir.) …..……………………………….15

*Jersey v. John Muir Medical Center* (2002) 97 Cal.App.4th 814 ….…...17

*Johnson v. Monson* (1920) 183 Cal.149 …….……………………….…..36

*Lynn Levitan v. Apple, Inc* (2016) BC622413 ……………………….....20

*Martin v. Leatham* (1937) 22 Cal.App.2d 442 ……………….………….36

*Minor v. FedEx Office & Print Services, Inc.* (2016) 182 F.Supp.3d 966.2

*Mixon v. Fair Employment & Housing Comm.* (1987)

192 Cal.App.3d 1306 …………………………………......………………20

*National Life & Acc. Insurance Co. v. Anderson* (1985) 187 Okla. 180..35

*Nixon v. Warner Communications, Inc.* (1978) 435 US 589, 596-97 .....27

*Pacific Gas & Electric Co. v. Bear Stearns & Co.*

(1990) 50 Cal.3d 1118 ........................................................24

*Parrott v. Bank of America* (1950) 97 Cal.App.2d 14 ...................34

*Popescu v. Apple Inc.* (2016) H040508 Cal.App.4th ....................23

*Powerhouse Motorsports Group, Inc. v. Yamaha Motor Corp.*

(2013) 221 Cal.App.4th 867 ................................................24

*Price v. Symsyk* (1993) 988 F.2d 1187, 1195 ...............................16

*Quelimane Co. v. Stewart Title Guaranty* (1998) 19 Cal.4th 26 ...........24

*Reeves v. Hanlon* (2004) 33 Cal.4th 1140 ................................25

*Richman v. Hartley* (2014) 224 Cal.App.4th 1182 .........................18

*Right Reason Publications v. Silva* (1998) 691 N.E.2d 1347 .............32

*Riverside Drainage Dist. of Sedgwick County v. Hunt*

(2004) 99 P.3d 1135 ........................................................32

*Robinson v. Magee* (1858) 9 Cal.81 ......................................18

*Rounds v. Delaware* (1876) 64 N.Y. 129, 134 .............................36

*Schubert v. Schubert Wagon Co.* (1928) 249 N.Y. 253 ....................36

*Seaman's Direct Buying Service Inc. v. Standard Oil Co.*

(1984) 36 Cal.3d 752 .......................................................30

*Sharp v. Auto Club of S. Cal.* (1964) 225 Cal.App.2d 648 ................34

*Shukh v. Seagate Technology, LLC* (2012) 873 F.Supp.2d 1087 ...........16

*Soules v. Cadam, Inc.* (1991) 2 Cal.App.4th 390 .........................18

*Spackman v. Good* (1966) 245 Cal.App.2d 518 ............................35

*Stark v. Advanced Magnetics, Inc.* (1995) 894 F.Supp. 555, 560 .........15

*Stansell v. Safeway Stores, Inc.* (1941) 44 Cal.App.2d 822 ..............36

*State Rubbish Collectors Assn. v. Siliznoff* (1952) 38 Cal.2d 330 ..........35

*Stevenson v. Superior Court* (1997) 16 Cal.4th 880 ......................17

*Stone v. William M. Eisen Co.* (1916) 219 N.Y. 205 ....................................36

*Sutherland v. Barclays American Mortgage Corp.*
(1997) 53 Cal.App.4th 299 .........................................................30

*Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 178 ...............17

*Taylor v. Marine Cooks & Stewards Assn.* (1954)
117 Cal.App.2d 556 ......................................................................34

*Tim Bucher v. Apple Computer, Inc.* (2005) 1-CV-035201 ............24, 26

*Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305 ..............29

*Tucker v. Naito* (1975) 188 USPQ 260 .............................................5

*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238 .....................17

*United States v. Crawford* (2001) 239 F.3d 1086 .............................31

*United States v. Real Property* (1999) 194 F.3d 1020 .......................32

*Van Slooten v. Larsen* (1980) 299 N.W.2d 704 ...............................32

*Vargas v. Ruggiero* (1961) 197 Cal.App.2d 709 ..............................35

*Walker-Rogers Post No. 662, Veterans of Foreign Wars*
*of U. S., Inc. v. Vigeant* (1980) 407 N.E.2d 1316 ............................32

*Wayne Goodrich v. Apple Inc.* (2012) 1-CV-230651 ........................26

*Weinbaum v. Goldfarb* (1996) 46 Cal.App.4th 1310 .........................18

*Wetherbee v. United Insurance Co. of America* (1968)
265 Cal.App.2d 921 ......................................................................34

*Wolf v. Sulik* (1919) 93 Conn. 431 ...................................................36

*Yates v. Taft Elks Lodge #1527* (1935) 6 Cal.App.2d 389 ...............36

*Youst v. Longo* (1987) 43 Cal.3d 64 ................................................25

*Zych v. Unidentified, Wrecked & Abandoned Vessel, Believed*
*to be SB "Lady Elgin"* (1990) 755 F.Supp. 213, 214 .......................32

**Statutes & Other Authorities**

35 U.S.C. §256 ……………………………………………...16-19

37 CFR 1.41(c) ……………………………………………….15

92 Stat. 1783 ……………………………………..…………………28

125 Stat. 284 ……………………………………………………16

§98.6 ……………………………………………………………16

§98.7 ……………………………………………………………16

§201 …………………………………………………...28, 29

§1041 …………………………………………………..19

§2924 …………………………………………………..18

§3294 …………………………………………………..26

§3335 …………………………………………………..31

§3336 …………………………………………………..31

§3355 …………………………………………………..31

§1102.5 …………………………………………………16

§11009 …………………………………………………18

§11065 ……………………………………………17, 21

§11068 ……………………………………………...16, 21

§12940 ……………………………………………17, 18, 22

§12945.2 …………………………………………………18

*California Causes of Actions* §4:10 ……….....………………………30

*Restatement (Second) of Torts* §46 …………………………….33, 34

*Ibid*, §766 ……………………………………………………..24

*Reagan, Robert. Sealing Court Records and Proceedings:*

*A Pocket Guide* Federal Judicial Center, 2010 …………………………...27

*Witkin, Summary of California Law, Contracts* §743 ………………….30

CACI No. 303, *Breach of Contract—Essential Factual Elements* …….....28

**INTRODUCTION**

Plaintiff's counsel (Ivan Halperin, 52450) submitted a 5-page demand letter (with a 26-page summary of facts) to Bruce Sewell, General Counsel and SVP of Apple, on November 2, 2016. The letter detailed defendant's nonjoinder of Mr. Eastman's critical innovation and responsibility in the creation of six US utility patents. It discussed discrimination, his unlawful September 23, 2014 termination (not subject to at-will employment in California) and covered the intentional conversion of plaintiff's personal property and common stock after termination.

The defendant assigned Deborah Rice (Director of HR Legal) to investigate these claims. Neither Ms. Rice or Mr. Sewell acknowledged counsels' periodic requests for updates for over one year and have yet to report any findings. During this time, both plaintiff and his counsel experienced significant medical events requiring hospitalization and temporary assisted living, yet still attempted to cause Apple to respond in good faith. Within one week of the demand letters submission to Mr. Sewell, electronic read receipts (disclosed in the email submission by counsel) showed 11 individual devices had examined the demand letter and the extensive supplemental material contained in the *Points & Authorities*. On February 27, 2018 plaintiff attempted to reach Mr. Sewell by email and it bounced— Mr. Sewell ignored the case for so long he no longer worked for Apple. Plaintiff emailed Mr. Sewell's manager (Tim Cook) asking for clarification; whether Apple would continue ignoring plaintiff's generous latitude to settle. On February 27, Diego Acevedo (Apple counsel) contacted plaintiff's counsel. Mr. Acevedo stated he wished to confer (per Mr. Cook) but never contacted counsel again. Plaintiff emailed Mr. Cook again on July 25,

attaching the same documents which had been sent over a year earlier to Mr. Sewell and comprise some of the *Points and Authorities*. Defendant has still not contacted counsel or the plaintiff, as of the time of filing. In keeping the plaintiff waiting in good faith for over one year before filing, defendant has exploited California's statute of limitations—purporting to "investigate" the matter without ever intending to do so. *Minor v. FedEx Office & Print Services, Inc.* (2016) 182 F.Supp.3d 966, 988. Intentionally ignoring counsel before litigations occurred unabated for almost two decades, as evidenced in *Grant v. Apple Computer, Inc.* (2001) 1-CV-802679. The guilty manager in this 2001 case was promoted to Senior Vice President in 2012.

Lastly, Apple ensured plaintiff had depleted available funds for legal representation from continued unemployment; forcing him to act *pro se*— causing his sole writing of this complaint. Six causes of action are presented after four sections in the statement of facts—one for intellectual property nonjoinder, one for unlawful termination, one containing background how Apple evolved from an honest company into a rampant and regular abuser of contract, discrimination and employment law; in addition to regularly acting without good faith in business dealings. This includes a disturbing practice of unlawfully terminating employees in the final days before Apple's October 1 fiscal calendar ends; who've made sizable contributions towards Apple's success, and/or, identified key quality problems before product shipment and subsequently were due favorable performance review compensation and/or vested granting of common stock previously awarded. Fourth, summarizes how Apple's unlawful actions have affected every aspect of plaintiff's life and continue today.

## STATEMENT OF FACTS

Plaintiff was awarded a utility patent for firmware signaling technology invented during development of the original MacBook Air computer. This allowed the practical sustainability of a product design where the laptop battery is permanently attached and not user serviceable. This increased plaintiff's credibility and value within Apple, empowering him to create innovations critical to Apple's continued success. After plaintiff temporarily losing his original iPhone in Milwaukee, Wisconsin, he invented a novel method and apparatus for locating a lost smartphone or computing device. After detailing the invention in a Radar application ticket (which is date/time stamped and unchangeable) plaintiff began shopping the new feature to members of engineering and ultimately the Director of iTunes marketing; who decried customers, "would hate such a feature and feel Apple was spying on them." The market advantage predicated Apple should allow users to locate their lost devices, which're more expensive than competitors. Realizing the feature would require the use of Apple's iCloud infrastructure to work correctly for Mac and iOS users, plaintiff contacted Eddy Cue (VP of iCloud) January 27, 2009. Mr. Cue replied that it was a good idea and now, "something we have on our list to consider." Plaintiff then reached out to Scott Forstall (VP of iOS) February 18, 2009 and explained his new feature, and, his exchange with Mr. Cue—who responded that, "it was a good suggestion."

After the initial June 15, 2010 release of the "Find my iPhone" feature, plaintiff emailed Mr. Forstall on March 8, 2009, asking if patent protection should be sought, but never heard from Mr. Forstall; he was then unsuccessful soliciting Apple's patent counsel. Plaintiff emailed Rick von

Wohld on March 24, 2009. Rick responded less than an hour later, stating, "Got it. Thanks Darren. I'll get back to you on this..." Mr. von Wohld never responded further. Despite being the sole inventor of the process and technology to locate a lost computer or device, plaintiff was nonjoinder from four US utility patent applications later filed in 2012 and 2013—subsequently granted by the USPTO.

Plaintiff also declared a process for selling mobile tickets using an Apple operating system on his 2006 Intellectual Property Agreement (IPA) that closely resembles claims in a utility patent defendant was granted for the "Passbook" application for event ticketing. Plaintiff only discovered being nonjoinder *in re* the Passbook patent after his unlawful termination, while researching the previous four nonjoinder patents for potential others—which followed a demonstrated and repeated pattern of discrimination by Apple, including, but not limited to its executives and legal group. While clearly not occurring in this matter, when there's no apparent disagreement, "[a]s between inventors their word is normally taken as to who are the actual inventors." See *Brader v. Schaeffer* (1976) 193 USPQ 627, 631.

A coinventor need not contribute to every claim of a patent; contribution to one claim's enough. "The contributor of any disclosed means of a means-plus-function claim element is a joint inventor as to that claim, unless one asserting sole inventorship can show that the contribution of that means was simply a reduction to practice of the sole inventor's broader concept." See *Ethicon Inc. v. United States Surgical Corp.* (1998) 135 F.3d 1456, 1460-63, 45 USPQ2d 1545, 1548-1551. The electronics technician in *Ethicon*, who contributed to one of the two alternative structures to define "the means for

4

detaining" in a claim limitation was held to be a joint inventor. Plaintiff contributed to at least one (or more) of the claims for all the patents in question, with none of the claims existing without plaintiff. Apple had no previous art or plans for such claims before he created Radar 6262545, and, his disclosures made in a 2006 IPA. Lastly, in *Tucker v. Naito* (1975) 188 USPQ 260, 263 it was found inventors need not "personally construct and test their invention." Further, "it is not essential for the inventor to be personally involved in carrying out process steps…where implementation of those steps does not require the exercise of inventive skill." See *In re DeBaun* (1982) 687 F.2d 459, 463, 214 USPQ 933, 936.

## II.

Plaintiff began working as an engineer for Apple in 2006, in large part from the efforts of CEO Steve Jobs—who was motivated by plaintiff's idea to build a low-cost Mac capable of running the OS X operation system for the education market; with all the ports streamlined in one place for easy, securable access in academia. Plaintiff designed a computer which would attain these goals while concluding graduate school; convincing Mr. Jobs to implement what became the eMac computer—inspiring a future generation to embrace technology. Plaintiff wasn't yet an Apple employee and nonjoinder for associated design patents. GC Nancy Heinen contacted plaintiff, stating she revised Apple's unsolicited idea submission policy [to what it remains today] based on plaintiff's role in the eMac, and, presenting the idea to Mr. Jobs of using Dave Matthews' "Everyday" for an iMac commercial. For eight years after joining Apple, plaintiff earned extremely positive performance reviews, a US utility patent for firmware technology, and, discretionary bonuses for his work on Apple products— including a

small restricted stock grant. In 2009, Mr. Jobs made the plaintiff promise that he'd always work for Apple and indicated that a job would always be available for him—honesty and loyalty were most important; he appreciated plaintiffs' commitment to Apple. Mr. Jobs further instructed him to *always* report anything he felt wasn't correct via email; if the proper channels and points were first exhausted. As part of his position description, plaintiff was responsible for exception processes from the executive team *in re* software and Mac quality issues. This caused plaintiff to give periodic updates to Mr. Jobs at his request, which ceased with his 2011 death. Plaintiff occasionally presented ideas for new Apple technologies, or, solutions to longstanding problems. Locating a lost device using another connected to the Internet became "Find my iPhone" and saw executives feel confident it was brilliant; while everybody else in the company felt it was very foolish. Such frustrations are commonplace at Apple and offer a clue why Mr. Jobs was passionate about having employees who'd done good work for him promise to remain working for him for the balance of their career. Many talented employees who've given part of their life for Apple were now regularly being disciplined and terminated for reporting issues they were expected to during Mr. Jobs tenure. Cronyism and a dedicated effort to ignore quality issues in current and future products became the most important projects to perpetuate the goal of ignoring the law and minimizing tax. This meant an end to communicating anything to customers. which encouraged a justifiable influx of litigation for anticompetition, quality and safety. Notifying Mr. Cook about issues (previously welcomed by Mr. Jobs) produces either no response, or, a threatening one later by your direct manager. A portion of nearly every day became tasked with dealing with customers, issues or otherwise projects related to product litigation, often for embarrassing and

simple causes which never had previously happened at Apple. Updates for every product are often untested, causing more significant issues than those they resolved—sometimes rendering applications or basic functionality to be completely unusable until another update fixes the regression in the previous update; which never (or rarely) exist in comparable products worldwide. Document retention notices sometimes were sent by legal multiple times per week—the fire drill approach of interrupting everything to stop and fix an issue which never would have existed previously began to cause undue strain, spawning itself yet more quality bugs; as a result of limited resources and a management focus on eliminating quality assurance and engineering positions in a zeal to acquire retail and treasury employees. This destroyed morale and caused many of the remaining engineers who made a difference to leave after 2011. This sparked a contentious and toxic environment; hiring managers with little technical experience to oversee the remaining engineers, who started to disappear suddenly without warning—because a stock option was due, or, a performance review which'd necessitate a large bonus and/or raise. The executive teams main focus is eliminating tax liability and bad PR being disseminated about Apple. No corporate responsibility exists at Apple since Mr. Jobs' death. There's no accountability, with attempts at doing the right thing met with swift retaliation. The continual pattern of Apple's already troubled HR and legal teams affecting the company began inadvertently driving Apples engineering focus, just as the elimination of institutional memory becoming a strong policy of middle management. Attempts to explain past failures to management in plaintiff's workgroup are akin to contentious and improper communication, irrespective of role. Employees who can remember when a proposed outcome has cost Apple dearly, or caused significant harm are always disregarded, discredited and

7

often terminated. In 2014, plaintiff's previous manager appeared to be unlawfully fired by his Director (William Heilman) for suggesting in a large meeting that a proposed project would cost millions of dollars and hundreds of thousands of hours of labor without any success, and, that it'd been attempted twice in the last 15 years. He was terminated; then, his daughter was terminated shortly thereafter; in a completely different division—for reporting issues with toxic mold in her building, which caused her and other employees to work-from-home. Despite contractors confirming the building could never be rid of mold, Apple signed a new multiyear lease, and, encouraged staff to return to the office after simply repainting. Plaintiff's former manager was recruited by Steve Jobs and managed both Developer Relations and the Developer Technical Support organizations previously. It was only a matter of time before any ethical employee, or, anyone who did work respected by Mr. Jobs was unlawfully terminated since Mr. Cooks tenure as CEO.

A regular practice among Apple management is to terminate employees in September, as Apple's fiscal calendar begins in October; this means that compensation due for the current years' work (including stock which may have taken multiple years to vest) is not granted. The stock can then be re-allocated to other employees and becomes an added bonus for managers to terminate experienced staff—this keeps both salary and tax costs minimized following the retirement of illegal anti-poaching activity at Apple after losing *High-Tech Employee Antitrust Litigation* in 2015. Complying with the law and paying what's honestly required is taboo at Apple, with judicial orders and paying tax (of any kind) representing the principal frustration of Apple's executives. Apple steadfastly believes in ignoring it's ethical and

business responsibilities; with the caveat it's always cheaper to settle a lawsuit, which takes effort, money and time to prepare. Even when Apple is presented with litigation, it files ridiculous motions which regularly challenge the rule of law and disrespect both the judiciary and due process, which also unnecessarily slows the judicial process. Apple tries to discredit and attack the character of customers and employees who've suffered wrongdoing and file a claim or complaint. At no point during plaintiff's tenure after Mr. Jobs' death has Apple done what was right and actually mitigated a legal issue without being ordered to do so by a court—often, a few years later, when the publics memory has faded. The renewed discussion *in re* eliminating the demurrer in California by the legislatures no doubt been fueled by Apple. Plaintiff was regularly assigned to help customers who wrote to executives after being ignored by Apple for reporting a problem; who, subsequently filed litigation—with the issue never being resolved, assuring them a nonmerchantable product. This is despite being well understood by engineering after plaintiff's diagnosis—often with a fix identified, but never released as an update. These customers' names would appear in document retention notices plaintiff received from legal.

In another of plaintiff's companion workgroups (all sharing one female administrative assistant, over age 40) Director Dan Lohr would regularly instruct her to do inappropriate things for him; both during work hours and off time—despite being nonexempt and not compensated for such actions. Regularly visiting Mr. Lohr's residence to retrieve personal belongings for him was commonplace. One occurrence saw her being asked to retrieve Euro currency secured in his personal safe at his residence and FedEx them to him while on holiday in Europe. Organizing his vacations was also

common; the distinction between personal servant and Apple employee wasn't understood by Mr. Lohr, causing the workgroups AA to be off-campus doing personal errands for him when needed at Apple, including plaintiff. Missing meal breaks commonly resulted—Mr. Lohr would never explain that she had a choice and could say no to such ridiculous discrimination without fear of being terminated as a member of a protected class for age discrimination. Mr. Lohr also was her direct manager, exercising a conflict of interest. When plaintiff would visit her cubical in need of sending urgent items to somebody, she'd sometimes be performing inappropriate tasks for Mr. Lohr, such as getting his home mail. After repeated occurrence since Mr. Lohr joined Apple, it became clear why she was suddenly unavailable so often—after years of always being more available than everybody else.

## III.

During his tenure at Apple from 2006 until 2014, plaintiff acquired 7 disabilities and became a member of a protected class in California. After having life-saving neurosurgery in 2013 and returning to work four months earlier than his recommended twelve-month recovery, plaintiff began experiencing discrimination, retaliation, reputational damage, favoritism, unfair business practices and ultimately unlawful termination—before the unlawful conversion of his personal property, and finally, breach of contract and good faith in business dealings. Such occurred on September 23, 2014, via personal email, as all his Apple access had been disabled without his knowledge, while at home on a sick day, and further, occurring minutes after the Office of the CEO had contacted plaintiff at home; for assistance investigating a software problem reported to Mr. Cook. Apple business is

forbidden using personal email and plaintiff's manager (Eric Barkve) had refused previous scheduled 1:1 meetings. Plaintiff still hasn't received a written warning (as of the time of filing) and it was explained via personal email that his fixing a critical quality bug in the Disk Utility application (in the then pending Mac OS update known as Yosemite) and attempting to solicit Mr. Barkve to do his job in ensuring the fix was integrated before customer shipment was improper communication—despite Mr. Barkve and his manager (Mr. Heilman) repeatedly refusing to perform their job positions, which ensure critical customer-facing issues are resolved in a timely manner with software updates. Plaintiff received several awards and was well-respected during his joint tenure as an Apple engineer and supervisory employee; having never being given a poor performance review, although management frequently omitted his IP achievements, or, key work with cross-functional teams such as legal and product marketing. After counsel asked plaintiff to obtain a copy of his employment file in June of 2015, it was found that it contained only his 2006 IPA, his termination letter sent via personal email, and, a single (highly negative) performance review for 2014—which Mr. Barkve submitted to HR over 3 months after unlawfully terminating plaintiff. The absence of an Apple employee handbook, as well as any explanation of Apple's disciplinary process for either current or new employees made plaintiff's counsel realize Mr. Barkve was unlawfully trying to conceal his wrongful termination of plaintiff *ex post facto*. Why waste time in fabricating a yearly performance review for an employee who hasn't worked for Apple since the previous year? An uneducated, unethical and unqualified Mr. Barkve; who has no college degree, no programming experience and little technical background for such a demanding position as plaintiff was qualified. Plaintiff was discharged

unlawfully one day before his compensation and stock were due on 1 October—as is SOP with Apple's key employees. Plaintiff unified Apple's graphics drivers (from the three companies used in Mac graphics cards, AMD, Intel and Nvidia) so that common functionality with external displays (such as remembering which of multiple, connected displays is primary, secondary or tertiary across computer restarts and sleep) and took three years to achieve. Some engineers theorized it could not be achieved, however, plaintiff saw results via diligent effort. Mr. Barkve was well-aware of the compensation such an achievement spanning three performance reviews would entail, enthusiastically discussing how this would reduce Mac support cost during a 1:1 meeting two months before his unlawful termination. It's no surprise *ex post facto* Mr. Barkve cancelled meeting requests with plaintiff in September; citing the need to leave Apple on two occasions in to reclaim children from school during normal business hours. Everyone on plaintiff's team indicated they'd had their performance review for 2014 *before* the second week of September. Since plaintiff had previously received extremely rare and superior past reviews (which required executive approval before they could be granted by his manager) plaintiff expected repeat occurrence; especially given his recent projects' completion after three years. Finally, plaintiff's termination letter stated he was, "providing a contentious atmosphere which made employees feel uncomfortable." This was instead what Mr. Barkve did regularly; both to plaintiff, his workgroup and others in engineering at Apple. If plaintiff could instead conduct a performance review of Mr. Barkve, it would include this *exact* phrase. Plaintiffs termination letters not signed, has a grammatical mistake and appears to have been originally written by somebody else; it's obvious Mr. Barkve intended to unlawfully terminate plaintiff—with the expectation

having HR deactivate his online and physical Apple access would magically communicate his premeditated malice, without him doing so. Plaintiff asked Mr. Barkve on September 13, 2014 and on September 26, 2014 for all documentation relating to his discharge and received nothing; making him unable to initiate Apple's Decision Review Process to appeal his discharge within two months, as only his termination notice and 2006 IPA are in his HR file—with nothing reviewable by a legal standard. The two-month limit always expires before terminated employees can get anything from HR, but, plaintiff couldn't, because his fabricated review wouldn't be created until March—a full 6 months after his termination.

## IV.

Upon the both devasting and unlawful loss of his job, property and stock through no fault of his own, plaintiff was diagnosed with post-traumatic stress disorder (PTSD) and continues to suffer emotional distress—from such events, reputational damage, and finally, not having been employed since. The *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 5th Edition* manual describes the "*essential feature*" of PTSD (at 274) as, "the development of characteristic symptoms following exposure to one or more traumatic events." Such events (as described throughout the complaint) constitute traumatic events. Plaintiff has difficulty sleeping, with a recurring theme in regular nightmares indicative of Apple punishing him *ex-post facto* for reporting said events to legal—the plaintiff's forced to continue working for Apple, but, without compensation, a desk, or, access to the internal applications or tools necessary to perform his job. As additional punishment for having a reasonable accommodation to work-from-home, plaintiffs manager makes him travel frequently; including

for meetings which're subsequently cancelled after his departure. Another event which caused emotional distress for plaintiff was that Apple didn't communicate his departure internally, which caused him to continue to receive work-related calls on his mobile phone into the next year, particularly from international locations. Apple also didn't communicate his departure to the IRS for the following tax year, causing a dreaded IRS audit for 2015; which didn't help plaintiffs PTSD, or, nightmares affecting his ability to sleep, and, affected his ability to timely file for unemployment (and later) disability insurance, causing him financial loss. Plaintiffs dubbed Apple, "*the gift which keeps on giving*" as it helps frame the unlawful employment practices Apple's legendary for—but only known about by a handful of people; a result of the defendant's rich abuse of demurrers and motions to seal. Being the most valuable company in the world gave Apple free license to break the law and then use unethical legal attempts to dismiss (or hide) the evidence from the public. While any other company faces sanctions, Apple's (apparently) been rewarded for its deceit and disrespect for the rule of law, explaining why it continues unabated. Apple will pay any price to contain public disclosure of its liabilities and the Court's gladly acquiesced in the past—perpetuating each of the continual offenses described herein. Due process and the rule of law will be restored to Apple employees by this complaint—even if appellate court and sanctions are necessary. A trillion-dollar worth doesn't preclude any entity from intentionally and repeatedly violating the law, without impunity.

**CAUSES OF ACTION**

1. Plaintiffs suffered financial and reputational damage as the original and putative inventor of the "Find my iPhone" feature, which later was the sole

basis for the "Find my iPad" and "Find my Mac" features. Apple committed nonjoinder of plaintiff in USPTO filings for utility patent applications **20130326643, 20130326642, 20140364099** and **20140199966**. Apple must amend these patents via **37 CFR 1.41(c)** as a violation of **35 U.S.C. §256**.

(A) Reputational damage qualifies for nonjoinder relief; for affecting one's employment via **§256**, see *Chou v. Univ. of Chi.* (2001) 254 F.3d 1347, 1357. In *Shukh v. Seagate Technology, LLC* (2012) 873 F. Supp. 2d 1087, the opinion states, "we hold that concrete and particularized reputational injury can give rise to *Article III* standing. As we noted in *Chou*, "being considered an inventor of important subject matter is a mark of success in one's field, comparable to being an author of an important scientific paper. We reasoned that pecuniary consequences may well flow from being designated as an inventor." Plaintiff hasn't been employed since his unlawful termination in September of 2015. The rehabilitation of plaintiff's professional reputation by joinder and recognition of said utility patents would improve his employment and financial prospects. Additionally, "the true inventor was left off the application as a result of a mistake and not as a result of deception, on the part of either the named inventor or the actual inventor." *Stark v. Advanced Magnetics, Inc.* (1995) 894 F. Supp. 555, 560. Plaintiff doesn't know (or recognize) any of the names listed as inventors for the patents in question. Any deception committed by the non-inclusion of plaintiff may have only occurred at an executive level (such as Mr. Forstall) or, by Apple counsel; none of which had any claim, or, could otherwise demonstrate participation in the development of claims in said patents. The consent of others named on said patents isn't necessary for a correction to be filed by Apple with the USPTO, as in *Iowa State Univ. Research*

*Foundation v. Honeywell Inc., Sperry Rand Corp.* (1971) 444 F.2d 406, 170, 374. Finally, none of the claims made in said patents could exist without plaintiff's innovation, as shown in multiple emails with Apple executives before the features in-question began research or development. Plaintiff easily passes the *"rule of reason"* test as defined in *Price v. Symsyk* (1993) 988 F.2d 1187, 1195. Plaintiff seeks relief per **35 U.S.C. §256** and the *Leahy-Smith America Invents Act*, codified as **125 Stat. 284**.

2. Plaintiff additionally suffered financial and reputational damage as a joint inventor of the "Passbook" electronic ticketing solution. Plaintiffs IPA had specific declarations for said art and was nonjoinder from Apple's filing of **20140364148** with the USPTO. Plaintiff (again) seeks relief per **35 U.S.C. §256** and the *Leahy-Smith America Invents Act*, codified as **125 Stat. 284**.

3. Plaintiff was unlawfully terminated, despite at-will employment, which violated the *Fair Employment and Housing Act*, *California Labor Code* **§98.6**, **§98.7** and **§1102.5**, *California Code of Regulations* **§11065** and **§11068**, and, breach of contract.

(A) Plaintiff won a small-claims action against Apple for concealing a memory defect he exposed in a personally purchased iPad Retina. Mr. Barkve was aware of the resulting memory corruption bug plaintiff filed and didn't assist in escalating to engineering management), so, **§98.6** also applies. This occurred in the months before plaintiff's unlawful termination, as plaintiff communicated the case and outcome to his manager—retaliation from Apple wasn't coincidental. **§12940(h)** includes protection, "from any employer, labor organization, employment agency, or person to discharge,

expel, or otherwise discriminate against any person because the person has
opposed any practices forbidden under this part or because the person has
filed a complaint, testified, or assisted in any proceeding under this part."

(B) Defendant committed "public policy" wrongful termination for fixing a
quality bug in the Mac Disk Utility application, which would erroneously
indicate to most users their computers hard drive was damaged when it
wasn't, as in *Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238. No
software engineer had been assigned to Disk Utility for three years, despite
being identified as mission critical, for obvious reasons in diagnosing and
fixing hard drive problems. No fix was scheduled for the bug in question,
however, great concern had been escalated to plaintiff about this bug from
support readiness employees—*in re* customers mistakenly becoming certain
their Macs hard drive needed replacement after checking it for errors, when
it did not. Such a contravening public policy affected millions of free
product users; meeting both constitutional and state provisions, as in *Gantt v.
Sentry Insurance* (1992) 1 Cal.4th 1083, 1094-1095 and *Green v. Ralee
Engineering Co.* (1998) 19 Cal.4th 66, 79-80. This subjects Apple to tort
liability, as in *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 178,
*Foley v. Interactive Data Corporation* (1988) 47 Cal.3d 654, 675-682 and
*Collier v. Superior Court* (1991) 228 Cal.App.3d 1117, 1121. As in
*Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 887 "An employer may
not discharge an at will employee for a reason that violates fundamental
public policy." As in *Jersey v. John Muir Medical Center* (2002) 97
Cal.App.4th 814, 821 it's noted that, "a discharge for the exercise of a
constitutionally conferred right, no less than the exercise of a statutory right,
may support a wrongful termination action in violation of public policy."

The plaintiff never willfully breached any employment duties, was never habitually neglectful, or, unable to perform them. A reasonable accommodation doesn't constitute breaching these said three characteristics identified by *California Labor Code* **§2924** as being valid reasons for dismissal.

(C) Defendant breached the express (or implied) agreement of an employer not to terminate, except in accordance with specified procedures or without good cause, as in *Soules v. Cadam, Inc.* (1991) 2 Cal.App.4th 390, 399. Given the lack of an employee handbook and no posted disciplinary procedures at Apple, plaintiffs termination was a breach of contract. Plaintiff never received a written warning and wasn't issued a second warning before being abruptly terminated. The policy plaintiff was alleged to violate isn't documented or disseminated anywhere at Apple and was protected speech, by a disabled person in a protected class. A wrongful termination claim arises out of "the employer's improper discharge of an employee" in an "employer-employee relationship" as in *Weinbaum v. Goldfarb* (1996) 46 Cal.App.4th 1310, 1315. To prevail on a cause of action for breach of contract, the plaintiff must prove (1) the contract, (2) the plaintiff's performance of the contract or excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damage to the plaintiff. See *Richman v. Hartley* (2014) 224 Cal.App.4th 1182, 1186. All four elements for breach of plaintiff's employment contract are clearly met, with further proof to be shown in the *Points and Authorities*. It's well known from *Robinson v. Magee* (1858) 9 Cal.81, 83. that, "a contract is a voluntary and lawful agreement, by competent parties, for a good consideration, to do or not to do a specified thing." Apple was founded 118 years later.

(D) Likewise, an employer cannot harass a member of a protected class for being part of that class. See *California Government Code* §**12940**. Apple breached contract in terminating employment of a disabled employee with a reasonable accommodation on-file without good cause, see *California Labor Code* §**1041**. Plaintiff was an exemplary employee and never received a poor performance review, or, negative feedback concerning his communication (or any) ability. Plaintiff had been working from home part-time under written guidance from his neurosurgeon, who then approved plaintiff to work from home full-time one month before his termination, as a result of his unsatisfactory work conditions. Despite producing a high volume of quality work from home which exceeded teammates at the office, plaintiff's manager and Director expressed disdain and uncertainty about whether they'd comply, but, didn't object.

(E) Plaintiff remains under continuing supervision and treatment for 7 disabilities which all began during his tenure with Apple, as defined in *California Government Code* §**12945.2**, subd. (C)(8). Its evident discrimination was a "substantial motivating factor" in plaintiffs' termination, as in *Davis v. Farmers Insurance Exchange* (2016) 245 Cal.App.4th 1302, 1320. *California Code of Regulations* §**11009**, subd. (c) states, "Discrimination is established if a preponderance of the evidence demonstrates that an enumerated basis was a substantial motivating factor in the denial of an employment benefit to that individual by the employer or other covered entity, and the denial is not justified by a permissible defense. A substantial factor motivating the denial of the employment benefit is a factor that a reasonable person would consider having contributed to the

denial. It does not have to be the only cause of the denial." This standard illustrates a reasonable person would conclude plaintiff was discriminated against in attempting to move into different positions to escape his growing uncomfortableness with his managers repeated careless and unethical decisions, attempting to claim recognition for his continued innovations, and, in his unlawful termination; which precluded the unlawful conversion of his personal belongings and vested common stock. While an employee isn't required to prove that the discriminatory motivation was the sole motivation behind a negative employment action and instead prove only a causal connection between the employee's disability and the termination, the plaintiff exceeds this threshold well beyond doubt, as in *Mixon v. Fair Employment & Housing Comm.* (1987) 192 Cal.App.3d 1306, 1319. Nobody else in plaintiff's workgroup appears to have been disabled, or, had a reasonable accommodation. As with everything Apple does unlawfully, past and recent precedents can be found before Apple moves to *"seal and conceal"* them from the public. In *Lynn Levitan v. Apple, Inc* (2016) BC622413, one of defendant's product safety counsel was wrongfully terminated after complaining of illegal and unethical issues, as well as a hostile and disparate work environment. When Ms. Levitan requested to work remotely, she was both criticized and denied the opportunity; even though her male counterparts were able to work remotely. Ms. Levitan's treatment by Apple worsened after raising questions about her work environment and Apple's conduct. While Ms. Levitan was discriminated against and refused the chance to work-from-home when male counterparts did, plaintiff was discriminated against working-from-home when other non-disabled counterparts (without reasonable accommodations on-file with HR) regularly did so, without impunity. This was also the case with plaintiff.

(F) *California Code* §11065, subd. (p)(2)(M), §11068, subd. (c) even
provide for time off completely, however, plaintiff didn't need (or request)
leave and was performing his job at the same exemplary level he previously
did in the office. Note §11065, subd. (p)(2)(L), specifically allows an
employee to work-from-home. Given §11065, subd. (p)(2)(C), states an
employee may be, "transferred to a more accessible worksite," and this was
never performed by defendant. On June 23, 2014 plaintiff's workgroup
moved to a new building, which didn't have enough capacity for everyone—
permission was granted from facilities to shorten all cubicles from the
minimum requirement. Only two cubicles on the floor had giant concrete
support pillars inside them, rendering it difficult to rotate in an office chair.
With 7 others on plaintiffs' team in good health, Mr. Barkve approved
plaintiff's assignment to one of two such cubicles.

(G) *California Code* §11068 provides priority for disabled employees to
attain suitable alternate or vacant positions, which the plaintiff's Director
refused to do on multiple times when plaintiff applied and made such
requests when positions in his workgroup were posted publicly. Managing
the analysis group (known as Carpe Facto) and an equivalent engineering
position focused on cellular carrier updates were the two most recent
examples. In each instance, internal employees were moved into such roles,
without public applicants appearing to have been considered. As in *Caldwell
v. Paramount Unified School District* (1995) 41 Cal.App.4th 189, 195 "an
employee must show the employer harbored a discriminatory intent" and the
plurality of evidence affirms this. Plaintiff was well-qualified to manage his
team and wasn't interviewed by Mr. Heilman when the position became

available after he unlawfully terminated the current manager. Mr. Heilman charged Mr. Barkve in team meetings with finding a replacement, despite already working on the team, like the plaintiff. No opportunity ever existed for a qualified applicant to be considered for the position.

(H) *California Government Code* §12940 provides that disabled employees have a right to work under different conditions than other employees, which never occurred without duress for the plaintiff from his manager and Director. "Working from home is not how we do business at Apple," was spoken to plaintiff on multiple occasions by Mr. Heilman. See *Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 54. Like Gelfo, plaintiff injured his lower back at some point at Apple, but, unrelated from his other disabilities. In plaintiffs companion workgroup, a female program manager appeared to be unlawfully terminated by Alan Coulson for working-from-home while disabled. Mr. Coulson seemed to dismiss her for dialing into a meeting he felt she should've attended in-person, despite being effective leading the meeting in plaintiff's opinion, and, despite many other employees also participating by telephone. The PM had a temporary medical condition precluding any prolonged position other than lying down without pain; which made sitting in a conference room impossible.

(I) Both business and contractual variants of interference occurred by the defendant's actions. The business interference, "was wrongful by some measure beyond the fact of the interference itself" as in *Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 392. Plaintiff was directly harmed by independently wrongful acts, such as retaliation against fixing a major quality bug and reporting numerous quality issues in products

before shipment, disastrous conduct in destroying his professional reputation
by not including him in patents for his inventions, terminating him days
before a 4-year RSU grant vested, refusing to interview him to manage his
team despite being more qualified than every applicant, and, as Apple
directly conspired with other companies in Silicon Valley (such as *Adobe,
Google, Intel, Intuit, Pixar* and *Lucasfilm*) to not allow plaintiff to be
considered for jobs with other companies he was qualified for as part of
*High-Tech Employee Antitrust Litigation* No. 11-CV-2509-LHK (N.D. Cal.
Jan. 30, 2015). Plaintiff was unable to secure positions at Google and Pixar
he was qualified and even interviewed for; in an attempt to escape the toxic,
unaccommodating and unethical working conditions at Apple, where they
acted as judge, jury and executioner; influencing plaintiffs' career and ability
to leave Apple. The nonjoinder patents would've caused plaintiff to be
awarded Apple's most prestigious (and hardest to achieve) award, the *Apple
Innovators Award*. This award would have increased plaintiff's income and
stature considerably—both inside and outside of Apple. Plaintiff was, "*a
stellar and highly valued employee*" like the employee at a partner company
Apple arranged to be unlawfully fired in *Popescu v. Apple Inc.* (2016)
H040508 Cal.App.4th. Pressuring a third-party company to unlawfully
terminate an employee shows the regular disregard Apple has for ethics, or,
the rule of law. Defendant has a long history of abusing disabled employees;
just before plaintiffs' tenure began with Apple in 2005, the well-liked vice
president of Mac hardware engineering was fired as a result of a "perception
that he suffers from a disability." Bucher's manager said he was "sometimes
manic depressive," and that his coworkers didn't "know how to handle that."
He then added, "I'm not sure what I'm going to do, but I think I'm going to
have to ask you to leave the Company," See *Tim Bucher v. Apple Computer,*

*Inc.* (2005) 1-CV-035201. Despite negative publicity, Apple continued its
unethical and unlawful termination practices, often with its best
employees—who's diligence has exposed terrible quality issues with
products causing delay in shipment, as plaintiff often did.

(J) Five elements must be alleged to support a claim for intentional
contractual interference, all of which were met, or exceeded. They are "(1) a
valid contract between plaintiff and a third-party; (2) defendant's knowledge
of this contract; (3) defendant's intentional acts designed to induce a breach
or disruption of the contractual relationship; (4) actual breach or disruption
of the contractual relationship; and (5) resulting damage." *Pacific Gas &
Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126. It isn't a
requirement that "the defendant's conduct be wrongful apart from the
interference with the contract itself, as in *Quelimane Co. v. Stewart Title
Guaranty Co.* (1998) 19 Cal.4th 26, 55. Further, a plaintiff need not establish
that the primary purpose of the defendant's actions was to disrupt the
contract, despite being obvious here. The tort's shown even where, "the
actor does not act for the purpose of interfering with the contract or desire it
but knows that the interference is certain or substantially certain to occur as
a result of his [or her] action." (*Rest.2d Torts*, §766, j, p. 12) Moreover, the
notion a noncontracting defendants' interest in an "interfered-with contract"
doesn't provide immunity from tort liability, as in *Powerhouse Motorsports
Group, Inc. v. Yamaha Motor Corp., U.S.A.* (2013) 221 Cal.App.4th 867,
883–884. Under at-will employment, contractual interference may be
pursued if, "the defendant engaged in an independently wrongful act." See
*Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1152.

(K) The five necessary elements of an intentional interference tort with prospective economic advantage (business interference) are "(1) an economic relationship between the plaintiff and some third-party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of that relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant. See *Youst v. Longo* (1987) 43 Cal.3d 64, 71, fn. 6. The business interference tort "is considerably more inclusive than actions based on contract or interference with contract and is thus not dependent on the existence of a valid contract." See *Buckaloo v. Johnson* (1975) 14 Cal.3d 815, 826–827. Plaintiff had a valid employment contract and IPA with Apple and was a member of the core team first making Apple the world's most valuable company. The five elements necessary for an intentional interference tort have been met or exceeded—along with the five elements of an intentional contractual interference tort.

4. Plaintiff's fully-vested Restricted Stock Units (RSU's) for 105 shares (currently 735 shares after a 7-1 split on June 9, 2014; before being awarded) were converted by defendant and removed from his E*TRADE brokerage account after their scheduled deposit occurred on October 1, 2015. Plaintiffs manager ensured his termination guaranteed his last day was only 15 days before the shares vested and 1 day before defendant's fiscal year ended, constituting fraud, malice and oppression, see *Haines v. Parra* (1987) 193 Cal.App.3d 1553. *California Civil Code* §3294, subdivision (a) provides that exemplary damages may be recovered "in an action for the breach of an obligation not arising from contract, where the defendant has

been guilty of oppression, fraud, or malice..." Pursuant to subdivision (c) of that section, fraud means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury. Exemplary damages are properly awardable in an action for conversion, given the required showing of malice, fraud or oppression, as in *Haigler v. Donnelly* (1941) 18 Cal.2d 674, 681 and *Cyrus v. Haveson* (1976) 65 Cal.App.3d 306, 316-317.

(B) In *Tim Bucher v. Apple Computer, Inc.*, defendant also terminated the plaintiff just before his RSU grant was due to vest—even with an employment contract which stated, "all unvested units of restricted stock granted to the plaintiff shall vest fully on the date the plaintiff's employment terminates, if employment terminates for reasons other than 'cause' as defined." Breaching contract with executives isn't a concern, so, handling individual contributors in the same manner has been SOP. In *Wayne Goodrich v. Apple Inc.* (2012) 1-CV-230651, Apple unlawfully terminated a trusted, well-liked employee because his RSU grant was about to fully vest. Apple has never stopped this predatory, vindictive and unlawful practice— which tends to happen to the best employees; who've contributed the most to Apple's phenomenal success, often at great personal cost.

Whenever an unlawful termination case with merits filed against Apple, they immediately move to have the proceedings sealed—typically only done with cases *in re* minor children and national security exceptions. Per guidance in *Sealing Court Records and Proceedings* (2010) is states, "courts will keep confidential classified information, ongoing investigations, trade secrets, and

the identity of minors, for example." Clearly, none of these very specialized conditions appear in this case; it's doubtful *every* Apple employment case involves classified information. Apple attempts to have every case sealed which can be publicly found, demonstrating both disregard of the *First Amendment* and incorrect understanding of the *Sixth*—wrongful termination cases are civil and not criminal—civil cases still must be impartial, Apple's best employees aren't guilty of national security or terrorist acts, they aren't minors, haven't performed a criminal act against Apple and finally, the existence of a plaintiff as a former employee's not confidential, or, a trade secret. Apple's "*motion to seal*" SOP has successfully insulated Apple from bad PR and caused affected employees (and survivors) to be unable to find information about the plurality of identical cases, even with retained counsel; let alone the general public—who have a right to know by law. The general public and news media have a qualified right of success to court proceedings and records, as in *Nixon v. Warner Communications, Inc.* (1978) 435 US 589, 596-97. Coupled with ignoring all demand letters sent to their legal group, this has allowed a discriminatory and unlawful practice to continue, unabetted for over a decade, perhaps longer. The apparent absence of admonishment and sanctions is disturbing—the Court rewarding Apple's continued unethical motives has given HR the confidence to continue unlawful employment practices; while reinforcing counsel's tactic of ignoring all legal communications outside litigation, and, attempts to deceive the public by wrongfully sealing cases rife with continued wrongdoing. It's lawful for other business entities to operate on a common, fair and transparent basis when summoned to Court, however, Apple enjoys special privilege only reserved for suspected terrorists under the *FISA Act* and the federal government—when Area 51 employees sue for injury damages. The

continued abuse and misinterpretation of California law by Apple to seal wrongful termination cases has caused a clear and present danger to others affected—the concept of *stare decisis* is preempted for Apple, as well as flawing the discovery process for others, ensuring the intentional lack of mitigation is never understood, and finally, raising the cost of actions against Apple to be unnecessarily high. In each instance, Apple almost always settles after an unnecessarily protracted amount of time, and, causes the plaintiff to sign a non-disclosure agreement. This strategy has continued unabated for over a decade; instilling no regard for law in HR, explaining why no mitigation ever happens. Apple steadfastly wants to continue its routine practice of discrimination and unlawful termination, and, no evidence to the contrary exists, else it'd be a matter of public record. The Courts encouraged Apple's greed, otherwise, plaintiffs' case would never have occurred, as such behavior's been commonplace at Apple before 2006.

(C) Given the necessary time had elapsed for plaintiff's restricted stock units to vest, defendant's in violation of *California Labor Code* §201 (a), which states that, "If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." Withdrawing plaintiffs RSU's after they were properly granted violates not just breach of contract and §201, but also, a breach of good faith and fair dealing.

5. The implied covenant of good faith and fair dealing is a general presumption that the parties to a contract will deal with each other honestly, fairly, and in good faith, so as to not destroy the right of the other party or parties to receive the benefits of the contract. **CACI No. 303**, *Breach of*

*Contract—Essential Factual Elements*, as approved at the December 2016
Judicial Council Meeting of the *Judicial Council of California* defines four
different conditions where a breach can seek remedy—two of which apply in
this case. First, a contract must be entered into and the significant things
required must be met, which occurred. Secondly, the defendant may do
something the contract prohibited them from doing, which harms the
plaintiff and was a substantial factor. In both elements, the causes for action
are met, although only one is necessary. Implicit in the element of damage is
that the defendant's breach caused the plaintiff's damage, which is clearly
obvious in this matter. See *Troyk v. Farmers Group, Inc.* (2009) 171 Cal.
App.4th 1305, 1352.

(B) In each related past case, Apple argues its duty to perform was
conditioned on an event which never occurred (obviously abusing
precedents like *Consolidated World Investments, Inc., v. Lido Preferred Ltd.*
(1992) 9 Cal.App.4th 373, 380, even when the plaintiff proves they honored
the conditions on their part, and further, didn't excuse Apple from its
contractual obligation to grant them stock owed. The discriminatory and
unlawful employment practices continue at Apple—all of which constitute a
clear breach of good faith and constitute unfair dealing, and finally, are
committed against their most loyal employees. *California Causes of Actions*
**§4:10** states that, "in every contract there is an implied covenant of good
faith and fair dealing by each party not to do anything which will deprive the
other parties of the benefits of the contract, and a breach of this covenant by
failure to deal fairly or in good faith gives rise to an action for damages."
See *Sutherland v. Barclays American Mortgage Corp.* (1997) 53
Cal.App.4th 299, 314, *Harm v. Frasher* (1960) 181 Cal.App.2d 405, 415,

1 *Seaman's Direct Buying Service Inc. v. Standard Oil Co.* (1984) 36 Cal.3d
2 752, 206 (overruled on other grounds) and *Freeman & Mills, Inc. v. Belcher*
3 *Oil Co.* (1995) 11 Cal.4th 85, as well as *Witkin, Summary of California Law,*
4 *Contracts* **§743**.

5 (C) It's hard to find instances where Apple does *anything* in good faith, or,
6 in fair dealing, especially since Mr. Cooks ascension. Nothing's unlawful to
7 Apple until it's caught and well-documented; that's when intimidation,
8 retaliation and unlawful termination occur—nearly always before review or
9 stock vesting time. For any employee who dares file litigation, their integrity
10 and credentials are questioned, and, they're usually silenced by having the
11 case sealed and/or completing a non-disclosure agreement—after being
12 compelled to settle by the judge. Apple regularly and wrongfully takes
13 advantage of its customers and employees by artificially controlling the truth
14 from public disclosure and disregarding the rule of law. The federal
15 government will have revealed its illegal cover-up *in re* what it knows about
16 the existence of extraterrestrial life before Apple's routine history of abuse,
17 discrimination and unlawful termination of its best employees has any
18 chance of being disseminated to customers and shareholders, let alone the
19 general public—until now. Each time Apple succeeds in unethical acts, due
20 process is further eroded; with the public trust trampled without its
21 knowledge. Courts are fair and open matters of public record, unless Apple's
22 participating. The public knows more about alien spacecraft than Apple's
23 continued conspiracy to discriminate against employees working-from-home
24 with reasonable accommodations, for example.

6. Plaintiffs personal property (including irreplaceable awards and engineering equipment) were converted, with no means made available to recover them after his unlawful termination. *California Civil Code* **§3355** and **§3336** apply. Mr. Barkve approved a two-week November vacation for plaintiff in June, so he could be married in Orange County. Mr. Barkve waited a month after plaintiffs "final day" at Apple in September to send his belongings and never once communicated with plaintiff, despite repeated attempts via telephone and text message. When plaintiff complained to Apple HR in mid-November, Nicole Atkinson (HR Legal) told plaintiff his possessions had been sent to his home address during the first week of November, and, that the required signature was not his, or, anyone else he recognized. She made no further effort to locate said belongings and wouldn't file a police report. Follow-up attempts via email and telephone with Ms. Atkinson were ignored. Given the irreplaceable nature, or "peculiar value" of the property converted by a "willful wrong-doer" **§3335** applies, see *Artists Embassy v. Hunt* (1958) 157 Cal.App.2d 371, 320. Further, plaintiff's unanswered communications indicated his possessions weren't abandoned or being donated to other employees. See *United States v. Crawford* (2001) 239 F.3d 1086, *Bruner v. Geneva County Forestry Dept.* (2003) 865 So.2d 1167, *Bobo v. Vanguard Bank & Trust Co. Inc.* (1987) 512 So.2d 246, *Right Reason Publications v. Silva* (1998) 691 N.E.2d 1347, *Allamakee County v. Collins Trust* (1999) 599 N.W.2d 448, *Riverside Drainage Dist. of Sedgwick County v. Hunt* (2004) 99 P.3d 1135, *Walker-Rogers Post No. 662, Veterans of Foreign Wars of U. S., Inc. v. Vigeant* (1980) 407 N.E.2d 1316 and *Van Slooten v. Larsen* (1980) 299 N.W.2d 704.

Plaintiff demonstrated not "renouncing utterly" his property by asking for it again in writing when mailing his Apple-owned devices to Mr. Barkve in October via FedEx, as in *United States v. Real Property at 2659 Roundhill, Alamo, California* (1999) 194 F.3d 1020, 1026. Further, plaintiff established no desire to abandon his belongings, as in *Zych v. Unidentified, Wrecked & Abandoned Vessel, believed to be SB "Lady Elgin"* (1990) 755 F.Supp. 213, 214 and *City of Houston v. Van De Mark* (2002) 83 S.W.3d 864.

7. Plaintiff suffered emotional distress from Apple's unlawful termination, and, reputational damage from not being properly recognized for his important innovations used worldwide daily on electronic consumer devices. The modern rule (*in re* emotional distress) states, "there is liability for conduct exceeding all bounds usually tolerated by a decent society, of a nature which is especially calculated to cause, and does cause, mental distress." See *Prosser, Law of Torts* (4th ed. 1971) 54. Plaintiffs continued, and, novel innovations have benefitted all of society worldwide, but not him; either professionally or personally from his utility patent nonjoinder. Clear economic, social and legal hinderances have been a direct result—it's unknown if plaintiff will ever regain employment again, which can only be the product of outrageous conduct performed against his person. Prosser further states that behavior may be considered outrageous if a defendant (1) abuses a relation or position which gives him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress. This is cited on 57 and in *Fletcher v. Western National Life Insurance Co.* (1970) 10 Cal.

App.3d 376. It's clear in this matter that (1) and (2) apply; the Court should respectfully decide (3), albeit moot, as only one of three's necessary.

(B) Tortious conduct in this case has resulted (and could be expected to result) in both economic loss and emotional distress. Emotional distress resulted (and could be expected to result) from both the conduct of Apple and the economic losses caused. In a case such as this, the invasion of economic interests might well outweigh the direct invasion of emotional tranquility, as in *Fletcher*. The tort of intentional infliction of emotional distress is designed to redress primarily invasions of the personal interest in emotional tranquility, not economic losses; unless, of course, the economic losses result from the intentionally caused emotional distress. *Restatement (Second) of Torts*, §46 and Prosser, *Law of Torts*, 43 *Fletcher* also found, "a rule placing the emphasis where it belongs and permitting recovery of all proximately caused detriment in a single cause of action is more likely to engender public respect for and confidence in the judicial process than a rule which would require attorneys, litigants and judges to force square pegs into round holes." Further, "if an action is one in tort, punitive damages may be recovered upon a proper showing of malice, fraud or oppression even though the conduct constituting the tort also involves a breach of contract." See *Acadia, California, Ltd. v. Herbert* 54 Cal.2d 328, 336-337, *Chelini v. Nieri* (supra), *Haigler* (supra), *Wetherbee v. United Insurance Co. of America* (1968) 265 Cal.App.2d 921, 928-929 and *Sharp v. Automobile Club of S. California* (1964) 225 Cal.App.2d 648, 653. Likewise, if the conduct is tortious, damages for emotional distress may be recovered despite the fact that the conduct also involves a breach of contract, as in *Crisci v. Security Ins. Co.* (1967) 66 Cal.2d 425, 432-434, *Acadia, California, Ltd. v. Herbert*

(supra) and *Taylor v. Marine Cooks & Stewards Assn.* (1954) 117
Cal.App.2d 556, 562-563.

(C) The defendants continued *recalcitrance*—ignoring this claim while
stating its counsel was investigating it for over one year without responding
easily meets the "continuing conduct" standard for distress in *Parrott v.
Bank of America* (1950) 97 Cal.App.2d 14, 24. Plaintiff's worry and anxiety
are inferably substantial and continued, especially given his disabled and
impecunious condition—which was infallibly known to Apple when they
acted. Susceptibility of the plaintiff to emotional distress and a defendant's
awareness thereof, are significant in determining liability, as in *Alcorn v.
Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 498, fn. 3. The plaintiff's
economic distress is decidedly severe, being unemployed since 2014. In
defining severity of distress, *Fletcher* found the term "severe emotional
distress" is discussed in comment j to §**46** of the *Restatement (Second) of
Torts*, noting that, "complete emotional tranquility is seldom attainable in
this world, and some degree of transient and trivial emotional distress is a
part of the price of living among people. The law intervenes only where the
distress inflicted is so severe that no reasonable man could be expected to
endure it. The intensity and duration of the distress are factors to be
considered in determining its severity. It appears, therefore, that in this
context, "severe" means substantial or enduring as distinguished from trivial
or transitory. Severe emotional distress means, then, emotional distress of
such substantial quantity or enduring quality that no reasonable man in a
civilized society should be expected to endure it." It's beyond reasonable
doubt that the plaintiff shouldn't be expected to endure the continued
distress inflicted by Apple. *Fletcher* also notes how, "it's well established

that one who, in exercising the privilege of asserting his own economic interests, acts in an outrageous manner may be held liable for intentional infliction of emotional distress." This was found in *Vargas v. Ruggiero* (1961) 197 Cal.App.2d 709, *Bowden v. Spiegel, Inc.* (1950) 96 Cal.App.2d 793, *State Rubbish Collectors Assn. v. Siliznoff* (1952) 38 Cal.2d 330, *Emden v. Vitz* (1948) 88 10 Cal.App.3d 396, *National Life & Acc. Insurance Co. v. Anderson* (1985) 187 Okla. 180 and *Continental Casualty Co. v. Garrett* (1935) 173. In each of the six cases, the "severe inflicted distress" doesn't appear as severe as in this case.

(D) Elements of a tort case for intentional infliction of emotional distress are: (1) outrageous conduct by the defendant; (2) the defendant's intention of causing or reckless disregard of the probability of causing emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct, as in *Spackman v. Good* (1966) 245 Cal.App.2d 518, 528-534, *Alcorn v. Anbro Engineering, Inc., supra* and *State Rubbish Collectors Assn. v. Siliznoff, supra*. It's obvious these four thresholds have been met, and further, that Apple's conduct causing distress was unprivileged, as in *Agostini v. Strycula* (1965) 231 Cal.App.2d 804, 808. In *Golden v. Dungan* (1971) 20 Cal.App.3d 295, the Court found the simple allegation a process server was banging on someone's door in the middle of night constituted a valid cause of action for mental distress. Nobody in "civilized society" could dispute plaintiff has endured significantly more unpleasant (and continued) mental distress than a process server visiting a home in the evening.

(E) Finally, *Carr v. Wm. C. Cromwell Co.* (1946) 28 Cal.2s 652, 654 explains that companies cannot claim immunity from tortious conduct of their employees. The employer's responsibility for the tortious conduct of his employee, "extends far beyond his actual or possible control over the conduct of the servant. It rests on the broader ground that every man who prefers to manage his affairs through others, remains bound to so manage them that 3rd persons are not injured by any breach of legal duty on the part of such others while acting in the scope of their employment." See *Alvarez v. New Haven Waste Material Corp.* (1999) 111 Conn. 377, 379- 381 and *Wolf v. Sulik* (1919) 93 Conn. 431, 436. Such injuries are one of the risks of the enterprise, as explained in *Hiroshima v. Pacific Gas & Electric Co.* (1936) 18 Cal.App.2d 24, 28, *Stansell v. Safeway Stores, Inc.* (1941) 44 Cal.App.2d 822, 824, *Johnson v. Monson* (1920) 183 Cal.149, 151, *Martin v. Leatham* (1937) 22 Cal.App.2d 442, 445, *Yates v. Taft Elks Lodge #1527* (1935) 6 Cal.App.2d 389, 390, *Rounds v. Delaware* (1876) 64 N.Y. 129, 134, *Doyle v. Scott's Cleaning Co.* (1930) 31 S.W.2d 242, *Alvarez v. New Haven Waste Material Corp.* (supra), *Higgins v. Watervliet Turnpike Co.* (1871) 46 N.Y. 23, 26, *Schubert v. Schubert Wagon Co.* (1928) 249 N.Y. 253, 256 and *Stone v. William M. Eisen Co.* (1916) 219 N.Y. 205.

**DEMAND FOR RELIEF**

1 Plaintiff prays for judgment against the defendant, APPLE, INC., for
2 correction of ownership (with the USPTO) for US Utility Patents
3 20130326643, 20130326642, 20140364099, 20140199966 and
4 20140364148, the regrant of 735 shares of Apple common stock, damages in
5 the sum of $326,400 dollars, interest in the sum of $32,640 dollars, costs of
6 this action, attorney fees of $5,000 and for such further relief as this Court
7 may deem proper.

8 I declare under penalty of perjury under the laws of the State of California that
9 the foregoing is true and correct.

Dated: 8/22/2018

DARREN EASTMAN